UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | NO. 05-40031-FDS |
| | ) | |
| KEITH GOODHUE | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by Paul G. Casey, Assistant
United States Attorney, respectfully submits this Sentencing
Memorandum regarding Defendant Keith Goodhue, currently scheduled
to be sentenced on November 21, 2005.  For the reasons provided
below, the government recommends that the Court impose a sentence
within the advisory Guidelines Sentencing Range.

### 1.    BACKGROUND

On November 11, 2003, Webster Police officers responded to
call for emergency medical assistance at a residence located at 4
Goodness Street, Webster, MA.  Paramedics and police arrived at
the residence and were let in to the residence by Keith Goodhue.
Officers and paramedics were taken to the bedroom where they
observed Keith Goodhue's wife lying unconscious with apparent
fresh needle marks on her arm.  Keith Goodhue advised police that
his wife had used heroin in the past, but that she had not used
any on this day.  Paramedics attempted to revive Goodhue's wife
using a variety of medical techniques, but were unsuccessful.
Paramedics transported Goodhue's wife to the hospital, where she

1

later recovered.

While the paramedics were taking Goodhue's wife out of the residence, officers observed a stained glass tube nearby on a wall shelf in plain view, which the officer recognized as a "pipe" used to smoke illegal drugs. Officers also observed two small amber glass bottles, a glass straw that contained a reservoir at one end with a bowl that appeared to be stained and burnt, and two smaller glass pipes all items consistent with smoking illegal drugs. One of the glass tubes appeared to contain small white crystals.

Keith Goodhue advised the officers that he did not believe that there were any narcotics in the house. Officers also observed two children's beds in the room as well as toys and clothes for small children scattered about the bedroom and learned from Goodhue that the Goodhues had two small children sleeping in the room. Concerned that there may be a needle and syringe containing a dangerous controlled substance in the room where small children sleep and play, officers began looking around the room for the needle and syringe. Keith Goodhue told police officers that he would help show the officers where the needles were just to get rid of them. Police officers were able to recover three needles and syringes in the top drawer of the dresser. Officers also noticed a glass evaporator used in a chemistry set with an attached rubber hose and a glass jar with

2

red stained coffee filters that appeared to be wet and marijuana seeds. In a second dresser drawer, police found a bottle of lye. Goodhue advised that he did not know the needles were in the drawer and that he didn't know what his wife was doing behind his back.

Officers advised Goodhue of his Miranda rights. Goodhue agreed to speak to officers and signed a written consent permitting the officers to search the rest of the residence. Goodhue told the officers that he would show them where the lab equipment was located. Officers recovered lab equipment including among other items, condensers, glass tubes, a two pan burner, a propane tank, a round bottom flask, glass beakers, tubing, funnels, coffee filters, scales, a pestle, and various narcotics paraphernalia including empty blister packs of cold medication containing pseudoephedrine.

Keith Goodhue gave the police a written statement admitting that he learned how to "cook" methamphetamine from watching another individual while living in New Mexico and that he had previously used methamphetamine. Goodhue said he brought the laboratory equipment back with him from New Mexico when he and his wife moved back to Massachusetts and that he kept it in the closet in the bedroom. Goodhue admitted that a few days prior to November 11, 2003, he pulled out the chemicals and laboratory equipment and planned to make methamphetamine. Goodhue admitted

3

that he had been intending to manufacture methamphetamine in order to sell it for money.  Goodhue further stated that he was not sure whether his wife had ingested some of the chemicals thinking it was methamphetamine and wondered whether ingesting the chemicals may have caused her illness.

Police and DEA agents recovered containers and bottles containing various liquids and powders from Goodhue's residence which were submitted to the Massachusetts State Police Crime Laboratory for further analysis.  A chemist identified, weighed and analyzed the following chemicals:  65.87 grams of red phosphorous, 116.37 grams of iodine, over 304.97 grams of Red Devil Lye, 4.64 grams of a mixture containing ephedrine, and 48.44 grams of mixtures containing pseudoephedrine.

According to agents, the chemicals are precursor chemicals used in methamphetamine manufacturing.  There are a number of different ways to manufacture methamphetamine.  Many of the red phosphorous methods of manufacturing methamphetamine (more commonly known as the "red-P" method) require extracting ephedrine or pseudoephedrine from the cold tablets, and combining the ephedrine and pseudoephedrine with red phosphorous, iodine crystals, lye, water and propane in a manufacturing process that utilizes common laboratory equipment and a cooking device such as a stove or burner.

4

## 2.   SENTENCING CALCULATION

### a.   Statutory Maximum Sentence

The charge carries a maximum penalty of twenty years of imprisonment and no mandatory minimum prison term.

### b.   Sentencing Guidelines Calculation

The Probation Department has expressed uncertainty in calculating the weight of the methamphetamine precursor chemicals, ephedrine and pseudoephedrine.  More specifically, the Probation Department is not sure whether to count the full weight of the precursor chemicals or use some alternative reasonable method to measure the weight of the substance.  For the reasons set below, the court should count the aggregate amount of the ephedrine and the pseudoephedrine suggested in the Pre-Sentence Report ("PSR").

USSG §2D1.11, Note B states that where the offense involves two or more chemicals set forth in the Quantity Table, the court should aggregate the quantities of all such chemicals and determine the base offense level corresponding to the aggregate quantity.  In the present case, it is clear that the aggregate amount of mixtures containing ephedrine and pseudoephedrine for which the defendant is responsible for is 53.08 grams, which would result in a corresponding base offense level of 28.  With a three-level departure for acceptance and a Criminal History Category of II, the defendant faces and advisory Guidelines range

of 63 to 78 months of imprisonment. [See PSR ¶ 105].  The
Probation Department's uncertainty appears to arise from its
consideration of USSG §2D1.11, Note (C), which states in part " .
. . in a case involving ephedrine, pseudoephedrine, or
phenylpropanolamine ("PPA") tablets, use the weight of the
ephedrine, pseudoephedrine, or PPA contained in the tablets, not
the weight of the entire tablets."  This provision is clearly
designed to address the common situation where a meth cook
purchases and possesses large quantities of Sudafed or other over
the counter cold medication containing ephedrine, pseudoephedrine
or pseudoephedrine.  The tablets there are easily measured and
the amount of ephedrine or pseudoephedrine is easily identified.
That situation does not apply in the present case.  The mixtures
in the present case are not tablets, but are a combination of
sludge and powder.  Therefore, USSG §2D1.11, Note (C) would not
apply.

     The defense cites United States v. Barnett, 989 F.2d 546,
553 (1st Cir. 1993), and the court's reliance there on a DEA
chemist's testimony that 50 kilograms of pseudoephedrine would
yield 29 kilograms of methamphetamine.  Using the same ratio, the
defense calculates that the 53.08 grams of ephedrine and
pseudoephedrine would produce 30.78 grams of methamphetamine,
which would result in a Guidelines base offense level 26 (before
acceptance).  The First Circuit decided Barnett in 1993.  At the

6

time of <u>Barnett</u>, the Guidelines effective for 1991 were
controlling, and courts were instructed under USSG §2D1.4,
comment. (n. 2)(1991), which read:

> Where there is no drug seizure or the amount
> seized does not reflect the scale of the offense, the
> sentencing judge shall *approximate* the quantity of the
> controlled substance.  In making his determination, the
> judge may consider, for example, the price generally
> obtained for the controlled substance, financial or
> other records, similar transactions in controlled
> substances by the defendant, and the size and
> capability of any laboratory added.

(emphasis added); <u>see also</u> <u>Barnett</u>, 989 F.2d at 552.  That
section was deleted in 1992. <u>See</u> USSG Appendix C, Volume II,
Amendment 447 (November 1, 1992).  In 2001, the United States
Sentencing Commission amended the Guidelines in response to the
three-part directive in section 3651 of the Methamphetamine Anti-
Proliferation Act of 2000, Pub. L. 106-310 which addressed
enhanced punishment for possessing List I chemicals.  <u>See</u> USSG
Appendix C, Volume II, Amendment 611 (May 1, 2001).  With the
change, the Sentencing Commission increased the penalties for the
methamphetamine precursor chemicals, and eliminated a six-level
disparity that existed between offenses that involved an "intent"
to manufacture methamphetamine and offenses that involved an
"attempt" to manufacture methamphetamine for offenses involving
ephedrine and pseudoephedrine.  The amendment specifically
instructed courts to count the aggregate weight of ephedrine and
pseudoephedrine and provided a specific guideline for the

7

aggregated weight of the combined chemicals. Id.; see also USSG
§2D1.11, comment. (note C).  The resulting Guidelines range of
63-78 months is the correct Guidelines Range.

     By way of cross-reference, it should also be noted that USSG
§2D1.11(c)(1) reads as follows: "If the offense involved
unlawfully manufacturing a controlled substance, or attempting to
manufacture a controlled substance unlawfully, apply 2D1.1 . . .
if the resulting offense level is greater than that determined
above."  Under the Drug Equivalency Table listed in §2D1.1,
ephedrine and pseudoephedrine are each equivalent to 10 grams of
marijuana.  The 53.08 grams of ephedrine/pseudoephedrine would
equate to 530.80 grams of marijuana and would place the defendant
a level 28 under 2D1.1(c)(6) with a Guidelines Range of 63-78
months (before acceptance).  This cross reference to §2D1.1,
which results in the same Guidelines offense level properly
calculated by the Probation Department under §2D1.11, is
consistent with the purpose of Amendment 611 and confirms that
the Guidelines intended to measure the aggregate total of the
ephedrine and pseudoephedrine.  The Court should adopt the
Guidelines calculations as set forth in PSR ¶¶ 28-36.

### 3.   GOVERNMENT'S RECOMMENDATION

     The government respectfully recommends that the Court impose
a period of incarceration within this Guidelines range as set
forth in the PSR.  Such a sentence would recognize the

8

seriousness of defendant's offense conduct, the need to promote respect for the law, provide just punishment, afford an adequate deterrence to criminal conduct and protect the public from further crimes of Goodhue. There are no unusual facts or circumstances that would justify a sentence below the advisory Guidelines sentencing range.

Goodhue seeks a downward departure based on USSG §5K2.0, arguing that there are mitigating factors not taken into account by the Guidelines. Goodhue cites to the fact that both the defendant and his wife appear to have serious drug addictions, and her likely ingestion of the chemicals or overdose of drugs may have resulted in the need for the defendant to call the police, that he would be the primary caretaker for the children and that he suffers from Valvular Aortic Stinosis and Multiple Sclerosis. "Drug addiction, a troubled childhood and/or prior leniency do not constitute permissible bases for departing below the GSR." United States v. Mayes, 332 F.3d 34, 37 (1st Cir. 2003) citing USSG §§ 5H1.4; 5H1.12; United States v. Black, 78 F.3d 1, 9 (1st Cir. 1996). This is not a situation where the defendant has demonstrated extraordinary pretrial rehabilitation. "[I]t is well settled that a defendant's efforts to overcome his drug addiction, while certainly commendable, will ordinarily not support a downward departure." United States v. Sklar, 920 F.2d 107, 117 (1st Cir.1990). In several cases, this court has

9

reversed departures for extraordinary rehabilitation based on a defendant's efforts to purge himself of addiction. See e.g., United States v. Craven, 358 F.3d 11, 15 (1st Cir.2004) ("Craven II"); Sklar, 920 F.2d at 117; see also United States v. Rushby, 936 F.2d 41, 43 (1st Cir.1991) (affirming refusal to depart on basis of pre-sentencing rehabilitation, including successful treatment for drug and alcohol addiction).

Family circumstances are also not a basis for a downward departure.  "The Sentencing Guidelines deem family circumstances a 'discouraged' ground for departure, and a district court may depart on the basis of a discouraged ground only in an 'exceptional' case." United States v. Louis, 300 F.3d 78, 81-82 (1st Cir. 2002); see also U.S.S.G. § 5H1.6; United States v. Pereira, 272 F.3d 76, 80 (1st Cir. 2001).  The First Circuit has affirmed departures for exceptional family circumstances only on rare occasions, noting that "time-consuming family responsibilities, by themselves, are not sufficient to take a case out of the 'heartland.' " Pereira, 272 F.3d at 80.  In United States v. Carr, 932 F.2d 67, 72-73 (1st Cir.1991), the First Circuit reversed a downward departure based on family circumstances because, even though Carr and her husband both faced prison terms, their 4-year-old child could be cared for by Carr's mother during their incarceration.  In United States v. Chestna, 962 F.2d 103 (1st Cir. 1992), the court found that

10

incarcerating a single mother of four young children (aged
thirteen, eleven, four, and less than one) would not cause the
exceptional family hardship required to depart from the
guidelines because "single mother status is not an idiosyncratic
circumstance . . . ." Id. at 107 (internal quotation marks
omitted). In Pereira, the court vacated a departure based on the
defendant's role in caring for his elderly parents because the
defendant did not provide specialized care, his siblings were
available to help with the parents' care, and home nursing
services provided an adequate alternative during the period of
the defendant's incarceration. 272 F.3d at 82-83. See also United
States v. Sweeting, 213 F.3d 95, 104-05 (3rd Cir. 2000)(departure
not appropriate for a single mother of five children, one of whom
had Tourette Syndrome, where the care provided by the mother was
to engage in daily exercise with the child, to help him keep his
school and home tasks organized, to administer his medicine when
necessary, and to remove certain foods from his diet).

The defendant's claim for departure under the Guidelines
based on his health would not support a basis for departure.  It
should be noted that the defendant reported to the Probation
Department only that he suffers from constant back pain as a
result of a past ruptured disc.  The defendant receives
disability income from the Social Security Administration as a
result. PSR ¶77.  The Probation Department's review of medical

records obtained from U Mass Memorial Hospital indicates that the defendant has been treated consistently for back pain and that he had "gait unsteadiness, painful arms and legs, parathesias, episodes of incontinence and low-back pain." PSR, ¶77.  The defendant never claimed that he suffers from either valvular aortic stinosis (his wife made this claim, who also admitted to lying to the Probation Officer on another matter, see PSR ¶71) or multiple sclerosis (raised now by defense counsel as the reason for his unsteady gait and in support of the downward departure). Nor has the defendant produced any medical records establishing supporting the claims of either illness.  The court should not automatically accept these claims without further corroboration and explanation as to what the conditions are and what the prognosis is.

"Physical condition ... is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.4. Thus, departures based on physical condition are discouraged. See United States v. Rivera, 994 F.2d 942, 948 (1st Cir. 1993) (listing several factors, including physical impairment, that are discouraged bases for departure). Nevertheless, "an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range." U.S.S.G. § 5H1.4; see also United States v. Woodward, 277 F.3d 87, 92-93 (1st Cir. 2002) (recognizing the

12

authority of the district court to depart in the case of an extraordinary physical impairment).  A court may find such an extraordinary impairment when imprisonment would threaten or shorten a defendant's life or when the Bureau of Prisons would be unable to adequately meet the defendant's medical needs. See United States v. LeBlanc, 24 F.3d 340, 348-49 (1st Cir. 1994) (upholding the district court's refusal to depart because "[t]here was no indication ... that [defendants's] life would be threatened or shortened by virtue of being incarcerated ... [or] that the Bureau of Prisons would be unable to adequately accommodate [defendant's] medical needs."). See United States v. Martin, 363 F.3d 25, 49 (1st Cir. 2004).  This policy statement requires that a defendant have an extraordinary physical impairment before downward departure may be considered. See United States v. Russell, 156 F.3d 687, 694 (6th Cir. 1998) (deafness alone may not be basis of departure under § 5H1.4). Significantly, the court in United States v. Thomas, 49 F.3d 253 (6th Cir. 1995), held that an HIV-positive defendant was not entitled to a downward departure because his HIV infection had not progressed into advanced AIDS.  Here, Goodhue has not made any showing that his multiple sclerosis or other illnesses had progressed into "an extraordinary physical impairment." See also United States v. Bailey, 211 F.3d 1270, (6th Cir. 2000) ("there presented little chance of a reduced sentence based upon

13

the diagnosis of multiple sclerosis. In particular, there is no suggestion that defendant was experiencing an extraordinary physical impairment at the time of sentencing").

Nor does Goodhue deserve a sentence below the Guidelines under United States v. Booker, 2005 WL 50108 (U.S. Jan. 12, 2005). In Booker, the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). The Court determined that a mandatory system in which a sentence is increased based on factual findings by a judge violates the right to trial by jury. As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines "effectively advisory." Booker, 2005 WL 50108, at *16. This ruling results in a system in which the sentencing court, while informed by the Guidelines, may impose any sentence within the statutory maximum penalty for the offense of conviction. The sentence will be subject to review by the Court of Appeals for "reasonableness." Id. at *24.

In the wake of Booker, this Court first must make a correct calculation under the existing Sentencing Guidelines, and then consider the final guideline calculation when determining the sentence to be imposed. Justice Breyer's majority opinion directed that "[t]he district courts, while not bound to apply

14

the Guidelines, must consult those Guidelines and take them into account when sentencing." Id. at *27.

The sentence in this case should fall within the advisory guideline range as determined by the Court. This view is shared by Congress and the Supreme Court. As every Supreme Court justice in the various opinions in Booker recognized, the Guidelines carry out the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history. See, e.g., id. at *21 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at *19 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction."); id. at *42 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at *47 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity.").

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation

15

of over 15 years of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address all of the considerations relevant to sentencing, as articulated in 18 U.S.C. § 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant;" "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ."

Thus, fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing, and should occur absent unusual circumstances.

Accordingly, a sentence within the Guidelines range is presumptively reasonable, and accommodates the Congressional purpose, affirmed by the Supreme Court, of obtaining fair sentences which are uniform to the extent possible. The

16

government anticipates that only sentences outside the Guidelines range will be subject to appellate scrutiny for reasonableness in light of the Congressional mandate.

In this case, no unusual circumstances exist which warrant an exception to the preference for guideline sentencing.    While the court may consider the defendant's health and his family situation in evaluating whether a non-Guidelines deviation under Booker is appropriate, the court should balance these claims against the fact that the defendant possessed dangerous and volatile chemicals, and turned a blind eye to the other illegal drugs and syringes in the same room as two small children.    The extraordinary danger of the situation was immediately apparent to the police upon their arrival and prompted the questioning of the defendant and the subsequent search of the residence.    The defendant, although voluntarily consenting to a search and agreeing to speak to the officers, maintained the lab equipment and was aware of the crack pipes and needles in the same room as the small children.    His lack of care toward the safety of the children should offset any potential mitigating factor raised by the defense.

Therefore, the government respectfully recommends that the Court sentence the defendant within the Guidelines range calculated in the PSR.

For all of the above reasons, the government respectfully

recommends that the Court impose the following sentence:

    1.   a period of incarceration within the advisory
Guidelines range established by the PSR;

    2.   a period of supervised release;

    3.   a fine within fine range unless the court waives the
fine;

    4.   a mandatory special assessment;

    5.   The 500 hour BOP drug treatment program, if eligible.


                          Respectfully submitted,

                          MICHAEL J. SULLIVAN
                          United States Attorney

                          PAUL G. CASEY
                          Assistant United States Attorney

Date:    November 16, 2005.