UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Docket No.  4:05-cr-40031-FDS |
| | ) | |
| KEITH GOODHUE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

MEMORANDUM ON BEHALF OF KEITH GOODHUE
<u>IN AID OF RE-SENTENCING</u>

Todd A. Bussert, Esquire
103 Whitney Avenue, Suite 4
New Haven, Connecticut 06510-1229

DATE:  September 24, 2007

## TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................. 1

II.  SENTENCING CONSIDERATIONS ......................................................... 1
     A.  History and Characteristics of the Offender .......................................... 3
     B.  Nature and Circumstances of the Offense ............................................ 5
     C.  Sentencing Range Established ............................................................. 7
          1. Application of Section 2D1.11 produces a Base Offense Level of 24 ................. 8
          2. Mr. Goodhue continues to merit a three-level reduction pursuant to § 3E1.1 ...... 9
          3. Mr. Goodhue has a Criminal History Category of I............................................ 9
          4. A departure reflective of Mr. Goodhue's post-offense rehabilitation efforts, as
             well as the selflessness exhibited in coming to his wife's aid, is warranted. .......... 12
     D.  Available Sentences & Need for Sentence Imposed ............................... 15


III. REQUESTED DISPOSITION ......................................................................... 19

# I. INTRODUCTION

This memorandum is provided for the Court's consideration on behalf of Keith Goodhue, who is scheduled to be re-sentenced on Wednesday, October 3, 2007, at 10:00 a.m.

On July 27, 2005, Keith Goodhue appeared before this Honorable Court and pled guilty to a one-count felony Information, which charged him with knowingly and intentionally possessing ephedrine, pseudoephedrine, red phosphorous and iodine, listed chemicals as defined in 21 U.S.C. § 802, with the intent to manufacture methamphetamine, a Scheduled II controlled substance, in a manner other than authorized by 21 U.S.C. §§ 801-904, in violation of 21 U.S.C. 841(c)(1). (Doc. 10, 26). On November 21, 2005, the Court sentenced Mr. Goodhue to 63 months' imprisonment to be followed by three years' supervised release, with conditions, and a $100 special assessment. Mr. Goodhue timely appealed. The Court of Appeals vacated Mr. Goodhue's sentence and remanded this matter for re-sentencing. United States v. Goodhue, 486 F.3d 52, 55 and 61 (1st Cir. 2007).

As set forth herein, application of the advisory Guidelines Manual produces a total offense level of 21, which, with a Criminal History Category of I, results in a recommended guideline range is 37-to-46 months' imprisonment. Mr. Goodhue respectfully submits that a term of imprisonment of no greater than 37 months is sufficient but not greater than necessary to satisfy the congressionally-recognized goals of sentencing. 18 U.S.C. § 3553(a).

# II. SENTENCING CONSIDERATIONS

In the wake of United States v. Booker, 543 U.S. 220 (2005), the overriding statutory duty in this as at every sentencing is to determine and impose the punishment which is "sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), to achieve the various purposes of criminal justice in the case at hand, after "considering" a list of factors, including what sentences are

"available."  Id.(a)(2),(3); see Rita v. United States, -- U.S. --, 127 S.Ct. 2456, 2465 (2007);

United States v. Scherrer, 444 F.3d 91, 95 (1st Cir. 2006) (describing § 3553(a) directive as

"'parsimony' principle, that is, the statutory guidance that a sentence should be no higher than

needed to meet statutory goals").  The listed purposes in Section 3553(a) are promotion of

respect for law, including the provision of just punishment in light of the seriousness of the

offense, id.(a)(2)(A); deterrence (both general and specific), id.(a)(2)(B); incapacitation to protect

the public, id.(a)(2)(C); and any needed rehabilitation and treatment of the offender, id.(a)(2)(D).

See United States v. Zapete-Gracia, 447 F.3d 57, 59 n.4 (1st Cir. 2006) (listing 18 U.S.C. §

3553(a) factors).

      More than anything perhaps, the advisory nature of the federal Guidelines means that real

world wisdom born of trial courts' unique perspectives and experience has a renewed place in the

sentencing process.  See Koon v. United States, 518 U.S. 81, 98 (1996) ("district court must

make a refined assessment of the many facts bearing on the outcome, informed by its vantage

point and day-to-day experience in criminal sentencing"), Mistretta v. United States, 488 U.S.

361, 404 (1989); cf. United States v. Aguilar-Pena, 887 F.2d 347, 353 (1st Cir. 1989) (pre-

Booker:  "Judicial dissatisfaction alone, no matter how steeped in real-world wisdom, cannot be

enough to trigger departures, lest the entire system crumble.").  As Justice Kennedy observed:

> It has been uniform and constant in the federal judicial tradition for
> the sentencing judge to consider every convicted person as an
> individual and every case as a unique case study in human failings
> that sometimes mitigate, sometimes magnify, the crime and
> punishment to ensue.

Koon, 518 U.S. at 113; cf. S. Rep. No. 225, 98th Cong., 1st Sess. 53 (1983) ("Under a

sentencing guidelines system, the judge is directed to impose sentence after comprehensive

examination of the characteristics of the particular offense and the particular offender.");

Developments in the Law:  Race and the Criminal Process, 101 Harvard L.R. 1472, 1638 (1988)

("Sentencing guidelines represent a compromise between the extremes of pure determinate and

indeterminate sentencing:  they guide the judge's discretion but permit some flexibility.").

Respectfully, applying the governing legal criteria and standard statutory construction

methodology to this case, the Court should find, at the conclusion of the re-sentencing hearing,

that the proper sentence -- that is, the sentence which seems, after consideration of the statutory

factors, to be "sufficient, but not greater than necessary" -- is no greater than 37 months'

imprisonment.

**A.      History and Characteristics of the Offender -- § 3553(a)(1) (in part)**

Appreciating that the presentence report (PSR), as revised on November 14, 2005,

presents information concerning Mr. Goodhue's background, we wish to touch briefly upon

several aspects of his life that merit consideration.

Like his parents and grandparents before him, Keith Goodhue hails from Gloucester,

Massachusetts.  Aside from issues of growing up without a father, who reportedly never paid

child support, Keith recalls a relatively normal childhood, where he excelled in school and

extracurricular activities, particularly ballroom dancing.  Keith reports having "a box of first place

trophies" earned while competing in ballroom dancing from age six-to-11.  He became involved in

the sport at the encouragement of his paternal grandmother, who paid for lessons, and stopped

only when his partner moved out-of-State.

It was not until age 13 that Keith began to push back against parental control ("to rebel"),

a stage he opines was exacerbated by his father's absence and the "generation gap" between him

and his maternal grandfather, with whom he was extremely close.  Robin Ann Goodhue asserts

that her son was the "best as you could find until 13"; he was "good" and an "all-A student."

During this period, however, Keith began to experiment with and use both drugs and alcohol. According to Mrs. Goodhue, several of his friends had parents who abuse drugs, namely heroin, and "they didn't care what their kids did." And no help was forthcoming from Keith's father, whom Robin Ann called for assistance. She reports that instead of intervening, Keith's father smoked marijuana with him.

Keith's drug use contributed to truancy: "We took him to school … He went out the back door," Mrs. Goodhue remembers. Notably, Keith did not drop out of school (PSR, p. 27 ¶95) until approximately age 18. Despite staying in school a year beyond his cohorts' graduation, Keith was only a sophomore by credits; he had passed his classes in school, but on a credit-reduced basis.

Keith reports that his drug abuse escalated at 17, following the death of his maternal uncle, Glenn Goodhue, from AIDS. Keith describes his uncle as his "older brother" — someone who "did everything for me" and exposed him to a different, more artistic way of life. Glenn reportedly took Keith to see "all the movies," as well as plays in Boston. He also showered Keith with gifts a Christmastime.

Keith also submits that treatment for a series of injuries may have contributed to his eventual, persistent abuse of opiates and opiate-derivatives, which is unique to him among his immediate and extended family. When he was approximately five years old, Keith broke his leg and was prescribed Percocet. At about age 11, he broke his right arm and, at 15, his left arm. Each time he was again prescribed Percocet, as he was at 16, when he broke his tailbone playing hockey. At 21, Keith used Percocet after rupturing discs in his back, which he did slipping on a curb after a night of drinking.

The PSR chronicles the throes of addiction in which Keith Goodhue found himself at the time of his November 2003 arrest. He was using heroin, Oxycotin and Barbiturates regularly, as well as occasionally using powder and crack cocaine. PSR, p. 25-26 ¶¶81-88. 91a. The arrest, and subsequent two months' detention, was a turning point, however. Following a period of forced detoxification and abstinence, Keith returned home to find that the Department of Social Services (DSS) had removed his children from the home. With his wife Susan, whom he had begun dating around age 13, Keith committed to securing the return of his children.

Robin Ann Goodhue's, in whose care the children were placed, reports that DSS workers were "amazed" because the children were "polite" and "smart." She credits their presentation and demeanor to the fact that Keith was so involved in their lives (e.g., reading to them regularly). Mrs. Goodhue also observed that upon his release from the local jail, Keith "seemed more responsible," knowing he had done wrong: "He was sorry for what he had done. He had ruined his life and the kids'." Mrs. Goodhue believes that her only child has put the past behind him for good: "He loves his kids and wants to help Susan."

## B.    Nature and Circumstances of the Offense -- § 3553(a)(1) (in part)

On November 11, 2003, Keith Goodhue discovered Susan in the bedroom of the couple's apartment, located in Webster, Massachusetts. See July 27, 2005 Rule 11 Transcript at ("7/27/05 Tr.") 17. Aware that Susan had used heroin in the past, but uncertain what, if anything, she had ingested that day, Mr. Goodhue called 9-1-1 for emergency medical assistance. Id. (Unbeknownst to Mr. Goodhue, Susan had suffered a stroke as a result of "bleeding on her brain" during the prior several weeks. PSR, p. 23 ¶¶69-70; but see November 21, 2005 Sentencing Transcript at ("11/21/05 Tr.") 36 (misapprehension that Mrs. Goodhue "overdosed on drugs"). Paramedics and Webster police officers responded to the call. 7/27/05 Tr. 17. Mr. Goodhue led

them to the bedroom, where Susan was observed unconscious with apparent fresh needle marks on her arm.  Id.  Attempts to resuscitate Mrs. Goodhue were unsuccessful, and paramedics transported her to the hospital, where she later recovered.  Id.; PSR, p. 2 ¶10.

As paramedics removed Mrs. Goodhue from the home, police observed a stained, glass tube on a shelf and believed the tube to be drug paraphernalia.  7/27/05 Tr. 18.  Officers also observed two small amber bottles, a glass straw that contained a reservoir at one end with a ball that appeared to be stained and burned, and two smaller glass pipes.  Id.  Police believed these items to be consistent with smoking illegal drugs.  Id.

Upon learning that the Goodhues had two children who slept in the room, police undertook a search for needles and syringes.  7/27/05 Tr. 18.  Mr. Goodhue responded by offering to assist, and the officers located three needles and syringes in the top drawer of a dresser in the bedroom.  Id.  The officers also observed a glass evaporator with an attached rubber house and a glass jar with red stained coffee filters.  Id.  In a second dresser drawer, police found a bottle of lye.  Id. 19.

Officers then advised Mr. Goodhue of his Miranda rights, and he proceeded to speak with them and sign a consent form for a search of the residence.  7/27/05 Tr. 19.  Mr. Goodhue directed the officers to the location of, inter alia, condensers, glass tubes, a two-pan burner, a propane tank, a round bottom flask, glass beakers, tubing, funnels, coffee filters, scales, a pestle, and assorted paraphernalia, to include empty blister packs of cold medication containing pseudoephedrine.  Id.  Police and agents of the federal Drug Enforcement Administration (DEA) recovered various liquids and powders from seized materials, which were submitted to the Massachusetts State Police Crime Laboratory for analysis.  PSR, p. 3 ¶15.  "The crime laboratory analysis of the substances seized … revealed the following controlled substances: 65.87 grams of

red phosphorous; 116.37 grams of iodine; (over) 304.97 grams of Red Devil Lye; 4.64 grams of a mixture containing ephedrine; and 48.44 grams of a mixture containing pseudoephedrine." United States v. Goodhue, 486 F.3d at 55; see PSR, p. 3 ¶15.

In a written statement given subsequent to the Miranda warnings, Mr. Goodhue acknowledged having learned how to cook methamphetamine from watching someone while living in New Mexico. 7/27/05 Tr. 20. He claimed to have brought the aforementioned equipment, which was seized from the bedroom closet, back from New Mexico, and admitted an intention to use it for the manufacture of methamphetamine. Id.; PSR, p. 3 ¶14.

**C.     Sentencing Range Established -- § 3553 (a)(4)**

Even in the post-Booker advisory system, correct calculation of a defendant's recommended range under the federal Guidelines is the necessary first step in the sentencing process. United States v. Jiménez-Beltre, 440 F.3d 514, 518-19 (1st Cir. 2006) (en banc). In this case, an issue critical to the disposition of Mr. Goodhue's case, originally as now, is how the methamphetamine precursor chemicals seized from his home should be measured for purposes of establishing a base offense level.

At the original sentencing, the question before the Court was what weight (literally) should be given to the seized mixtures of ephedrine and pseudoephedrine, which were of unknown purity. See 11/21/05 Tr. 7. After hearing arguments from both sides, the Court used the total aggregate weight of the mixtures, 53.08 grams. Id. 22. Your Honor did so with express reservations, however:

> [W]ith some hesitation, I'm going to conclude that I am going to treat this as a Level 28.
>
> My hesitation comes from this: As I expressed earlier, 2D1.1 had a note that says, you should use the entire weight of any mixture or

substance containing a detectable amount of a controlled substance. 2D1.11 doesn't have that note.  And it also a note that says in the case of tablets, you use the weight of the drug only, not the weight of the entire tablet.  I'm not sure that that's consistent.  It's -- it doesn't quite sit right with me.

But since under both the theory that the defense offered, under the theory the government offered, and under the theory that the Court was inclined to follow at the outset, that all wind up at Level 28; and, I'm therefore going to sentence at a Level 28, as I indicated, with at least some hesitation.

Id. 22-23.  On appeal, Mr. Goodhue challenged the propriety of using the aggregate weight of the ephedrine and pseudoephedrine mixtures.

The Court of Appeals determined that the Court's interpretation of Guideline Section 2D1.11 did not constitute plain error.  United States v. Goodhue, 486 F.3d at 60.  However, it did offer guidance for resolution of situations such as the instant case presents, while also allowing that this Court may reconsider Mr. Goodhue's "entire sentence" on remand.  Id. 55.  Given that the weight of pure ephedrine and pseudoephedrine contained in the previously identified mixtures is now indeterminable, an alternative approach, relying on the seized red phosphorous, is warranted.

1.  Application of Section 2D1.11 produces a Base Offense Level of 24.

Under section 2D1.11, the relevant drug weight for sentencing purposes is the weight of the precursor chemicals themselves.[1]  The burden is on the government to prove the weight of the precursor chemicals to the district court.  The initial question ordinarily is whether the methamphetamine precursors contained in such a non-tablet mixture may be isolated and separately weighed.  The burden is on the prosecution to show that the isolation and weighing of the precursors is not feasible.

United States v. Goodhue, 486 F.3d at 60.

---

[1]  The analysis supporting this holding is incorporated herein by reference.  United States v. Goodhue, 486 F.3d at 58-60.

Discovery materials provided to Benjamin Entine, Mr. Goodhue's prior counsel, show that DEA agents assisted local law enforcement in seizing the chemicals, supra, from the Goodhue home, on November 11, 2003. Cf. PSR, p. 3 ¶15. In particular, Task Force Agent (TFA) Rodney Budrow, working in conjunction with at least two DEA special agents and other law enforcement personnel, seized the chemicals and maintained control of them until they were secured at the Webster Police Department. The following day, TFA Budrow picked the chemicals up from the Police Department and weighed and sealed them before delivering them to the Massachusetts State Police Crime Laboratory for analysis.

On information and belief, the chemicals (exhibits) were maintained at the State Lab until judgment entered in this case, on November 30, 2005. At some point thereafter, they were destroyed. See Govt. Appeal Br. at 29; see also, United States v. Goodhue, 486 F.3d at 61 n. 11. On information and belief, during the approximate two-year pendency of Mr. Goodhue's prosecution, which began in State court, neither State nor federal lab technicians attempted, or were directed, to isolate and weigh the ephedrine and pseudoephedrine present in the seized mixtures notwithstanding the government's recognized obligation and defense objections to its "simple" approach. Compare, e.g., 11/21/05 Tr. 12 with Id. 21-22. In short, the actual weight of ephedrine and pseudoephedrine present in the aggregate, 53.08 gram mixture relied upon at Mr. Goodhue's original sentencing cannot be calculated. Moreover, and significantly, aside from Rule of Lenity considerations, there exists no reasonable method by which to now derive a reliable estimate. See United States v. Rivera-Maldonado, 194 F.3d 224, 228 (1st Cir. 1999) (reasonable estimate of drug quantity must be based on adequate indicia of reliability and support in the record).

9

For these reasons, an alternate approach is required. As the Court previously observed, the Guidelines provide the appropriate course, namely reliance on the 65.87 grams of isolated red phosphorous. 11/21/05 Tr. 19; see U.S.S.G. § 2D1.11-Note(4)(a). Reliance on this precursor chemical results in a base offense level of 24. U.S.S.G. § 2D1.11(e)(4).

    2.  <u>Mr. Goodhue continues to merit a three-level reduction pursuant to § 3E1.1.</u>

Upon the government's application, the Court previously granted Mr. Goodhue a three-level acceptance of responsibility adjustment. 11/21/05 Tr. 23. Nothing in the record establishes or suggests that such an adjustment should not be granted at re-sentencing. With no other identifiable enhancements or reductions, Mr. Goodhue's total offense level is thus 21.

    3.  <u>Mr. Goodhue has a Criminal History Category of I.</u>

Adopting the Probation Office's calculations, the Court previously found that Mr. Goodhue had a criminal history score of three, which produced a Criminal History Category of II. 11/21/05 Tr. 6, 23. Mr. Goodhue challenged this calculation on appeal, and the government agreed that it was incorrect. <u>United States v. Goodhue</u>, 486 F.3d at 54.

The "Criminal History Computation" section of the presentence report notes correctly that Mr. Goodhue has one prior conviction that generates a single criminal history point. PSR, p. 15 ¶45 (referencing p. 12 ¶41). However, the Probation Office erred in attributing two additional points under Guideline Section 4A1.1(d) since Mr. Goodhue was <u>not</u> under a criminal justice sentence at the time of the instant offense PSR, p. 15 ¶46. The PSR shows that when Mr. Goodhue was stopped for driving a motor vehicle with a non-functioning headlight, on or about October 31, 2002, police discovered that he did not possess a license to operate the vehicle, and

he was so charged ("OP MV W/Susp Lic").  PSR, p. 14 ¶43.[2]  On August 12, 2003, the State

Court determined sufficient facts existed but entered a continuance without a finding until

February 13, 2004, imposing $200 in costs and a $50 contribution to the victim witness fund.[3]

That was then the effective posture of the State case when Mr. Goodhue was arrested for the

conduct underlying the instant offense, on November 11, 2003.

Guideline Section 4A1.1(d) reads:  "Add **2** points if the defendant committed the instant

offense while under any criminal justice sentence, including probation, parole, supervised release,

imprisonment, work release, or escape status."  Application Note 4 to Section 4A1.1 offers

further guidance:

> For the purposes of this item, a 'criminal justice sentence' means a
> sentence countable under §4A1.2 (Definitions and Instructions for
> Computing Criminal History) having a custodial or supervisory
> component, although active supervision is not required for this item
> to apply.  For example, a term of unsupervised probation would be
> included; but a sentence to pay a fine, by itself, would not be
> included.

Section 4A1.2(c) identifies those sentences that are counted and those that are to be excluded.

With respect to "Driving without a license or with a revoked or suspended license," that offense is

only to be counted "if (A) the sentence was a term of probation of at least one year or a term of

imprisonment or at least 30 days, or (B) the prior offense was similar to an instant offense."

U.S.S.G. § 4A1.2(c)(1) (2003 ed.).  Neither of those considerations applies to Mr. Goodhue's

---

[2]  The Probation Office's reference in Paragraph 46 to the "Dudley District Court" appears
mistaken since the "8/12/03" disposition is listed as having occurred in the Uxbridge
District Court.  PSR, p. 14 ¶43.  Paragraph 44 lists a 2005 traffic matter in the Dudley
District Court.

[3]  See Massachusetts Court System's "Disposition Codes" at http://www.mass.gov/
courts/probation/dispositioncodes.htm (distinguishing CWOF from CWOF SP,
"Continued w/o finding supervise by prob").

prior offense.  Accordingly, attribution of two criminal history points was incorrect.  Mr.

Goodhue is properly scored with a Criminal History Category of I.

A total offense level of 21 and a Criminal History Category of I produces a recommended

guideline range of 37-to-46 months' imprisonment.  However, assessment of the guidelines also

requires determination of any applicable downward departures.  United States v. Saez, 444 F.3d

15, 17 (1st Cir. 2006).  The record supports a downward departure in this case.

> 4.  A departure reflective of Mr. Goodhue's post-offense rehabilitation efforts, as well as the selflessness exhibited in coming to his wife's aid, is warranted.

> > *A departure sentence is still a guideline sentence, not an end-around the system.  A sentence must not only fit the crime but also the individual who committed it.*

Richard P. Conaboy, Address to the Federal Sentencing Guidelines Seminar (Clearwater Beach,

Florida  May 14, 1998).[4]

Pre-guidelines, rehabilitative efforts and potential were one of the myriad factors that

federal courts could permissibly consider when determining an appropriate sentence.  See United

States v. Grayson, 438 U.S. 41, 49 (1978) (citations omitted); United States v. Foss, 501 F.2d

522, 528 (1st Cir. 1974) ("The court's duty to 'individualize' the sentence simply means that,

whatever the judge's thoughts as to the deterrent value of a jail sentence, he must in every case

reexamine and measure that view against the relevant facts and other important goals such as the

offender's rehabilitation.").  Post-guidelines, the issue was unsettled until Koon, supra, after

which the majority of courts agreed that such efforts were legally permissible grounds for relief,

---

[4] Judge Conaboy offered the quoted remarks while Chairman of the United States Sentencing Commission.  Prior to that, he served, inter alia, as U.S. District Judge for the Middle District of Pennsylvania and chaired the Pennsylvania Commission on Sentencing from 1977 to 1980.

that is, a downward deviation from a defendant's recommended range.[5]  Although the Fourth

Circuit established a widely accepted standard—a court may depart where the defendant's efforts

are present to an exceptional degree that is atypical of the circumstances that give rise to an

acceptance of responsibility adjustment, the Second Circuit did observe that "[a]cceptance of

responsibility is easily achieved and is accordingly of relatively low value.  Defendants who

accomplish a successful rehabilitation go far beyond what is required to qualify for the deduction

under § 3E1.1."  Compare U.S. v. Brock, 108 F.3d at 35 with U.S. v. Core, 125 F.3d at 78.

Here, the Court finds a defendant who made "concrete gains toward 'turning his life

around" separate and apart from what is required to qualify for a § 3E1.1 reduction and, in so

doing, demonstrated genuine remorse for his misdeeds while demonstrating a commitment to

rebuild and repair his life.  U.S. v. Sally, 116 F.3d at 81.  From the point of his arrest to the point

of sentencing, Keith Goodhue maintained total sobriety and actively sought treatment.  By all

accounts, the instant prosecution, coupled with his wife's hospitalization, served as the proverbial

wake-up call.

Massachusetts authorities arrested Mr. Goodhue, on November 11, 2003, and he was held

in State custody until January 13, 2004.  He then remained in the community until July 27, 2005,

at which time this Court remanded him into custody pursuant to 18 U.S.C. § 3143.  From March

---

[5]  See, e.g., United States v. Whitaker, 152 F.3d 1238 (10th Cir. 1998) r'vrsing United States v.
Ziegler, 39 F.3d 1058 (10th Cir. 1994); United States v. Green, 152 F.3d 1202 (9th Cir.
1998); United States v. Rhodes, 145 F.3d 1375 (D.C. Cir. 1998) (determination of
whether defendant's work, education and other rehabilitative activities exceeded "to an
exceptional degree" the rehabilitative efforts of all defendants is a question for the district
court); United States v. Kapitzke, 130 F.3d 820 (8th Cir. 1997); United States v. Core,
125 F.3d 74 (2nd Cir. 1997) ("It is far easier to take 'tentative step[s] towards
rehabilitation' than to accomplish that goal.")(citation omitted); United States v. Sally,
116 F.3d 76 (3rd Cir. 1997); United States v. Brock, 108 F.3d 31 (4th Cir. 1997) r'vrsing
United States v. Van Dyke, 895 F.2d 984 (4th Cir. 1990).

4, 2004 to July 4, 2004, Mr. Goodhue participated voluntarily in inpatient treatment through the

Salvation Army's Adult Rehabilitation Center in Worchester.  During those two months:

> [H]e attended all mandatory meetings, arrived on time for his
> counseling sessions, and maintained an excellent work ethic in his
> work therapy assignments.  All random urines tested negative.  He
> got along well with others.

Exhibit (Ex.) A; see PSR, p. 26 ¶92 (uncorroborated).  Mr. Goodhue was discharged from the

program after traveling home one Saturday to see his wife and children under the mistaken belief

that a day-pass had been approved, as it had the preceding two weekends.  On July 29, 2004, he

entered AdCare Hospital's outpatient program, through which he participated in 16 sessions over

a three-month period.  Ex. A.  As confirmed by the Department of Social Services, Mr. Goodhue

also consistently produced negative urine screens from September 2004 until February 2005.  Id.;

see 11/21/05 Tr. 26 (government noting that Mr. Goodhue is "doing better today than he was

back in 2003" and "has tested and has been clean").

    In sum, we respectfully submit that the Court give renewed consideration to Mr.

Goodhue's rehabilitation, which is not a prohibited ground for downward departure.  United

States v. Sklar, 920 F.2d 107, 115-16 (1st Cir. 1990) ("extraordinary rehabilitation" appropriate

basis for departure); see United States v. Perella, 273 F.Supp.2d 162 (D.Mass. 2003).  His

offense conduct was clearly tied to issues of chemical dependency and, given his level of use,

freeing himself from addiction without relapse was, and is, no small measure of achievement.  Mr.

Goodhue's movement away from a lifetime of chemical dependency also reflects change of a more

fundamental and lasting sort, the renewed commitment to family and the future.  Keith Goodhue

has shown himself to be the type of individual who, on some level, welcomes the intrusion of

14

prosecution and judicial intervention because it provides a mechanism to correct a course of wrongful conduct one knows to be wrong.

What is equally, if not more, remarkable about Mr. Goodhue is that he willingly brought this case upon himself by subordinating his welfare to that of his wife. Finding Susan unconscious and in obvious distress, Mr. Goodhue did not allow the potential legal ramifications of permitting emergency responders into his home, which contained drug paraphernalia in the open, to prevent him from taking morally and ethically correct remedial measures. Additionally, even after medical personnel had begun to tend to Susan, Keith continued down the path of rightness by assisting law enforcement in locating any potentially harmful materials and by providing an inculpatory statement. He did all this not knowing, or arguably being able to predict, that approximately 18 months later he would be brought into federal court to answer for his misdeeds.

Respectfully, the drafters of the Guidelines did not envision or account for the type of altruism demonstrated by Keith Goodhue in a moment of extreme personal crisis, which should be acknowledged and rewarded with a downward departure pursuant to Section 5K2.0. No matter how poorly one may perceive Mr. Goodhue, common decency and societal betterment demand that credit be given for doing the right thing in such circumstances.

**D.    Available Sentences & Need for Sentence Imposed -- §§ 3553(a)(2), (a)(3)**

The Court has significant discretion in imposing a sentence that it finds appropriate and just. Of note, when assessing the propriety of the established guideline range, it is significant that in a Federal Judicial Center study conducted a decade ago both district court judges and chief probation officers ranked sentences for drug offenses as the most "harsh" (i.e., least fair) of the categories of offenses surveyed. M. Johnson & S. Gilbert, The U.S. Sentencing Guidelines: Results of the Federal Judicial Center's 1996 Survey 112 (1997).

Mr. Goodhue has, of course, been in federal custody since July 2005. As reflected in the attached BOP printout, Mr. Goodhue was designated to the Federal Correctional Institution-Medium in Fairton, New Jersey, where he has served his sentence to date without incident. Ex. B. Indeed, through active engagement in an array of classes, he has used his time in custody to better himself, just as he did while in the community post-arrest. The question thus becomes whether additional time in custody is necessary to achieve the goals ends set forth in 18 U.S.C. § 3553(a).

In this regard, the Court's evaluation of Mr. Goodhue and the sentence to be imposed must account for, inter alia, whether and how it promotes respect for the law, provides a just punishment, affords adequate deterrence, protects the public and provides needed educational or vocational training in the most effective manner. 18 U.S.C. § 3553(a). See ABA Standards on Criminal Justice, Sentencing 18-6.1(a), p. 219 (3rd ed. 1994) ("The sentence imposed should be no more severe than necessary to achieve the societal purposes for which it is authorized."). In terms of the traditional aims of sentencing:

> It is useful to see [deterrence, incapacitation, and rehabilitation] as utilitarian. Each rests on the premise of minimizing the suffering of both offender and potential victims; the amount of intrusion into the offender's life is only an amount necessary to achieve effective crime control. By contrast, retribution, which began dominating sentencing theory in the 1980s, is premised on society's collective need to have basic cultural abstractions reinforced by claiming just deserts from offenders and vindication for the outraged feelings of those who restrain themselves within the confines of the law.

Arthur W. Campbell, Law of Sentencing, § 2:1 (2d ed. 1991); see John D. Hewitt & Todd R. Clear, The Impact of Sentencing Reform: From Indeterminate to Determinate Sentencing, 23 (1983) ("It is apparent that the retributive position is based on the rejection of utilitarian goals of

corrections."). Respectfully, a sentence greater than 37 months' imprisonment is unnecessary and excessive.

In terms of incapacitation and retribution, Mr. Goodhue submits that nothing in the instant conviction suggests that he is a danger to the community or an offender for whom substantial incarceration is necessary. See ABA Standards on Criminal Justice, Sentencing 18-6.4(a), p. 227 ("A sentencing court should prefer sanctions not involving total confinement in the absence of affirmative reasons to the contrary."). Quite the opposite, beyond his record of post-arrest progress, there is empirical support for the proposition that Mr. Goodhue is unlikely to re-offend. See USSC, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines at 12 (2004) ("Recidivism rates decline relatively consistently as age increases."). Leaving aside whatever general deterrence might arguably result from the sentence imposed[6], no more than three years' incarceration followed by three years' court supervision provides more than ample deterrent to this 32-year-old, married father of two.

With respect to rehabilitation, the law recognizes that such an end is not to be achieved through imprisonment. See 18 U.S.C. § 3582(a) and 28 U.S.C. § 994(k); see also ABA Standards on Criminal Justice, Sentencing 18-6.4(b), p. 227 ("A sentencing court should not select a sanction of total confinement because… of the offender's apparent need for rehabilitation or treatment."). Furthermore, the notion that rehabilitation, particularly as it pertains to drug abusers, can be achieved through incarceration is oft-rejected within academic circles:

---

[6] See Kittrie, et al., Sentencing, Sanctions and Corrections: Federal and State Law, Policy, and Practice, 29 (2d ed. 2002) ("Generally speaking, … legal and sociological scholars have raised serious questions about the power of any punishment to deter crimes.") (citation omitted); Law of Sentencing, § 2:2 (weakness of general deterrence theory is "underlying assumption that people weigh rationally the consequences of their behavior") (citations omitted).

> The idea that persons can achieve a greater self- and social control over drug use in prison is perhaps the greatest single harm committed by the social engineering mentality in the United States… The policy of imprisoning drug takers has had long-term, permanent effects, most of which have ranged from the sad and bad to the vicious and criminal. Rehabilitation has not been aided by enforced confinement… When a person is dependent on drugs, the proper goal for the individual or society is freedom from the necessity to use… [T]he aim is to achieve a freedom from a reliance upon a particular substance…

> Addicted, abusive, or dependent drug takers are labeled persons whose use had led to problematic life circumstances, ranging from arrest and unemployment to divorce or social isolation. To use coercion to impose upon such a person the capacity to be free of a dependency seems the cruelest of hoaxes, the most senseless of punishments. To liken the social control of social work intervention, or even mandatory treatment, to the policy of penal sanction seems a bit insensitive to commonly understood differences of degree.

David Matza and Patricia Morgan, Controlling Drug Use: The Great Probation, in Punishment and Social Control, 229, 239 (Thomas C. Bloomberg & Stanley Cohen eds., 1995); see ABA Standards on Criminal Justice, Sentencing 18-6.4(b), p. 227 ("A sentencing court should not select a sanction of total confinement because… of the offender's apparent need for rehabilitation or treatment."); cf. Alan Dershowitz, Fair and Certain Punishment, 74 (1976) ("The rhetoric of rehabilitation is sometimes used to justify confinement decisions based, in actuality, on an assumed need for isolation or on a desire to punish.").

Finally, in shaping a sanction, Mr. Goodhue asks that the Court weigh the broader impact of sentencing and correctional decisions:

> Imprisonment … excludes offenders from economic and political participation, and loosens prisoners' relationships with families and communities. While prison may not necessarily function as a 'crime school,' it destroys many of the connections an offender ultimately needs to regain his place in society.

18

Nora V. Demleitner, Smart Public Policy:  Replacing Imprisonment with Targeted Nonprison

Sentences and Collateral Sanctions, in A More Perfect System:  Twenty-Five Years of Guidelines

Sentencing Reform, 58 Stanford L.R. 1, 345 (2005) (citations omitted); see Loren A.N.

Buddress, Federal Probation and Pretrial Services — A Cost-Effective and Successful Community

Corrections System, Federal Probation 5 (March 1997) (citing study by the Administrative of the

Courts showing that real cost of imprisonment to taxpayers, accounting for loss of unpaid tax

revenue, welfare benefits, etc., is considerably higher than mere cost of confining prisoner).

According to Susan Goodhue, Keith has not seen his children for more than one year, and his

daughter is seeing a psychologist to cope with emotional issues related to his incarceration and the

resultant separation.

      The above considerations, taken independently or jointly, support the imposition of a non-

Guidelines sentence.

### III.  REQUESTED DISPOSITION

      For the above reasons, as well as any others that the Court may find appropriate and just,

Keith Goodhue respectfully submits that a sentence of no more than 37 months' imprisonment

followed by three years' supervised release is reasonable, sufficient and not greater than necessary

to achieve the ends of retribution, incapacitation, deterrence and rehabilitation.

      In terms of the judgment to enter, Mr. Goodhue asks that the Court make clear that he is

to receive credit for all time served since his arrest, namely from November 11, 2003 to and

including January 13, 2004, and from July 27, 2005 to the present.  It is also requested that the

Court expressly recommend that the Bureau of Prisons afford Mr. Goodhue the maximum

opportunity to transition back into the community through pre-release placement at a Residential

Reentry Center (formerly Community Corrections Center).  Judicial recommendations play an

important role in such designation and transfer determinations.  See Woodall v. Federal Bureau of

Prisons, 432 F.3d 235, 245-46 (3d Cir. 2005) (discussing 18 U.S.C. § 3621(b)); see also, Sept.

15, 2005 Ltr. from BOP Director H. Lappin to the Federal Judiciary at 2 ("Our rate of

accommodating judicial recommendations averages approximately 75 percent.").

Dated: September 24, 2007          Respectfully Submitted,
                                     KEITH GOODHUE


                                   By:_____/s/ Todd Bussert_____
                                      Todd A. Bussert, CT24328

                                 103 Whitney Avenue, Suite 4
                                 New Haven, CT 06510-1229
                                 (203) 495-9790

                                 Attorney for Keith Goodhue




CERTIFICATE OF SERVICE

      I hereby certify that this document, filed through the ECF system (with exhibits), will be

sent electronically to the registered participants as identified on the Notice of Electronic Filing, on

September 24, 2007.



                                   _____/s/ Todd Bussert_____
                                   Todd Bussert

WILLIAM BOOTH
FOUNDER

JOHN LARSSON
GENERAL

LAWRENCE R. MORETZ
TERRITORIAL COMMANDER

LT.-COLONEL TIMOTHY A. RAINES
ADULT REHABILITATION
CENTER'S COMMANDER



FOUNDED 1865

# THE SALVATION ARMY
(INCORPORATED)

### ADULT REHABILITATION CENTER
72 CAMBRIDGE STREET
WORCESTER, MA 01603
MAIL – P.O. BOX 763 (01613)
TELEPHONE (508) 799-0528
FAX (508) 799-0856

January 9, 2007

Dear Sir/Madam:

RE: Keith Goodhue

I am writing to inform you of the discharge of the above stated person. According to our record, you are to be notified of this person's discharge. The following is a brief summary of their discharge conditions:

- ♦ Beneficiary's Name: Keith Goodhue
- ♦ Admission Date: March 4, 2004
- ♦ Date of Discharge: July 4, 2004
- ♦ Statement of Discharge (Unsatisfactory): Beneficiary was terminated as he left the building while being on a thirty-day restriction. Therefore he was considered to be AWOL. During his stay with us, he attended all mandatory meetings, arrived on time for his counseling sessions, and maintained an excellent work ethic in his work therapy assignments. All random urines tested negative. He got along well with others.

We meet the basics of a person's needs including, shelter, food, and clothing. All beneficiaries participate in Christian worship services, Bible studies, and a host of other social activities. We provide individual counseling, groups, educational opportunities, and work therapy to prepare people to reconnect with their community. Our program time is flexible enough to allow us to work with each person at his/her pace. We maintain a drug-free environment with in-house and community self-help programs available.

If you have any questions or concerns, please do not hesitate to contact me at the above stated number. Thank you for your time and consideration of the above mentioned person's need for our service.

Sincerely,

Major Carol Ann Copeland
Director of Program and Residential Services

CHQ Approved Letter - Rvsd. 10-18-2006



# ADCARE HOSPITAL
### OF WORCESTER, INC.

April 5, 2007

                                   RE:    Keith Goodhue
                                   DOB:   11/2/74
                                   M.R.:  69530

To Whom It May Concern:

This letter will verify that the above mentioned patient was admitted to AdCare
Hospital of Worcester, Outpatient Program, on July 29, 2004, and attended sessions on
the following dates:

      8/2/04, 8/6/04, 8/11/04, 8/16/04, 9/8/04,  9/13/04, 9/20/04, 9/21/04,
      9/22/04, 9/27/04, 9/28/04, 9/29/04, 10/4/04, 10/11/04, 10/18/04
      and 10/25/04.

If you have any further questions, please do not hesitate to contact us.

Yours truly,

*Karole A. Messier*

Karole A. Messier, RHIA, D.ABQUARP
Director of Health Information Management Services, QI/RM

KAM/mc

**This information has been disclosed to you from
records whose confidentiality is protected by
Federal Law.  Federal Regulation (42 CFR.Part 2)
prohibits you from making any further disclosure
of it without the specific written consent of the
person to whom it pertains, or as otherwise
permitted by such regulation  A general
authorization for the release of medical or other
information is NOT sufficient for this purpose
The Federal rules restrict any use of the
information to criminally investigate or prosecute
the patient.**



MITT ROMNEY
Governor

♦

KERRY HEALEY
Lieutenant Governor

♦

TIMOTHY R. MURPHY
Secretary

♦

LEWIS H. SPENCE
Commissioner

♦

CORINNE M.
CONTARINO
Area Director

The Commonwealth of Massachusetts
Executive Office of Health and Human Services
**Department of Social Services**
**South Central/ Blackstone Valley Area Office**
185 Church Street, Whitinsville Massachusetts 01588
Tel (508) 234-1000 ◆ Fax (508) 234-4110

August 7, 2006

To Whom It May Concern:

This letter is to document the fact that Keith Goodhue was involved with the Department of Social Services from 11/03 to 8/05 when he entered the Rhode Island House of Corrections in 8/05. The family continued to work with the Department until 10/05.

The following information documents the results of Keith Goodhue's drug screens from 9/04 to 2/05. There were no additional drug screens submitted by Keith after 2/05.

Negative drug screen results were received for the following dates: 9/8/04; 9/11/04; 9/16/04; 9/29/04; 9/21/04; 9/24/04; 9/27/04; 9/29/04; 10/5/04; 10/8/04; 10/15/04; 10/20/04; 10/23/4; 10/27/04; 11/1/04; 11/5/04; 11/10/04; 12/2/04; 12/16/04; 1/11/05; 2/14/05.

Sincerely,

Marcela Ramirez Blue
Department of Social Services

**SENSITIVE BUT UNCLASSIFIED**



# Federal Bureau of Prisons
# Psychology Data System

**Date-Title:** 04-07-2006 - GRP CLOSED [40] Introduction to Psychology

**Reg Number-Name:** 80516-038 - GOODHUE, KEITH     **Unit/Qtrs:** A, A01-103LH

**Facilitator:** BRIAN M. REDONDO, Psy.D., STAFF PSYCH

**Institution:** FAI - FAIRTON FCI

---

**Status:** COMPLETED

**Enroll - End Date:** 04-07-2006 - 09-28-2006

**Total Hours:** 16.0

## SESSION DATA:

**Number of Sessions:** 17   **First-Last Session:** 04-07-2006 - 09-22-2006

| ID | TITLE | DATE | DUR | ATTEND | PART | HMWK |
|----|-------|------|-----|--------|------|------|
| 17 | Psychological Disorders (cont) | 09-22-2006 | 60 | C | G | N |
| 16 | Psychological Disorders | 09-08-2006 | 60 | C | G | N |
| 15 | Psychosocial Development | 08-11-2006 | 60 | C | G | N |
| 14 | Parenting & Moral Development | 08-04-2006 | 60 | C | G | N |
| 13 | Attachment & Socialization | 07-28-2006 | 60 | C | G | N |
| 12 | Social Cognitive & Humanistic Theories | 07-14-2006 | 60 | C | G | N |
| 11 | Ego Defense Mechanisms | 07-07-2006 | 60 | C | G | N |
| 10 | Freud (cont.) | 06-30-2006 | 60 | C | G | N |
| 9 | Freud (continued) | 06-23-2006 | 60 | C | G | N |
| 8 | Personality Theory: Freud | 06-16-2006 | 60 | C | G | N |
| 7 | Stress & Health | 06-09-2006 | 60 | C | G | N |
| 6 | Alcohol Abuse & Treatment Barriers | 05-25-2006 | 0 | AU | N | N |
| 5 | Obesity & Cigarette Smoking | 05-19-2006 | 60 | C | G | N |
| 4 | Health Psychology | 05-11-2006 | 60 | C | G | N |
| 3 | Psychological Perspectives (continued) | 04-21-2006 | 60 | C | G | N |
| 2 | Psychological Perspectives | 04-14-2006 | 60 | C | G | N |
| 1 | Introduction & Expectations | 04-07-2006 | 60 | C | G | N |

| Attendance | | Participation | | Homework | |
|------------|--------|---------------|--------|----------|--------|
| Complete | 94.12 % | Good | 94.12 % | Satisfactory | 0.0 % |
| Incomplete Excused | 0.0 % | Fair | 0.0 % | Unsatisfactory | 0.0 % |
| Incomplete Unexcused | 0.0 % | Poor | 0.0 % | N/A | 100.0 % |
| Absent Excused | 0.0 % | N/A | 5.88 % | | |
| Absent Unexcused | 5.88 % | | | | |
| Expelled | 0.0 % | | | | |

## TEST DATA:

| Id | Title | Type | Date of Test | Score |
|----|-------|------|--------------|-------|
| 5 | Exam # 5 | *Other* | 09-28-2006 | 102 |
| 4 | Exam # 4 | *Other* | 08-25-2006 | 93 |
| 3 | Exam # 3 | *Other* | 07-20-2006 | 95 |
| 2 | Exam # 2 | *Other* | 06-23-2006 | 87 |
| 1 | Exam #1 | *Other* | 04-25-2006 | 92 |

## COMMENTS:

**SENSITIVE BUT UNCLASSIFIED**

```
    FAITX          *          INMATE EDUCATION DATA          *          09-07-2007
PAGE 001 OF 001 *                    TRANSCRIPT              *          14:04:26

REGISTER NO: 80516-038      NAME..: GOODHUE                      FUNC: PRT
FORMAT.....: TRANSCRIPT      RSP OF: FAI-FAIRTON FCI

--------------------------  EDUCATION INFORMATION  --------------------------
FACL ASSIGNMENT DESCRIPTION                   START DATE/TIME STOP DATE/TIME
FAI  ESL HAS     ENGLISH PROFICIENT           02-23-2006 0926 CURRENT
FAI  GED HAS     COMPLETED GED OR HS DIPLOMA   02-23-2006 1100 CURRENT

---------------------------  EDUCATION COURSES  ----------------------------
SUB-FACL    DESCRIPTION                   START DATE  STOP DATE EVNT AC LV   HRS
FAI         PARENTING FROM AFAR           06-12-2006  CURRENT
FAI         PORTABLE TYPEWRITER           06-18-2007  08-27-2007  P  C  P      6
FAI         ENGLISH COMPOSITION I         05-21-2007  09-06-2007  P  W  I      0
FAI         FRIDAY NIGHT AT THE MOVIES    06-22-2007  08-23-2007  P  C  P      2
FAI         ENVIRONMENTAL PROTECTION      08-22-2007  08-24-2007  P  C  P      1
FAI         ONE DAY WORKSHOP/PLANET EARTH 08-17-2007  08-22-2007  P  C  P      1
FAI         CHILD STORYTELLING            11-16-2006  11-16-2006  P  C  P      1
FAI         RPP6/PAR/1                    05-22-2007  05-24-2007  P  C  P      1
FAI         INTRODUCTION TO MATH          01-22-2007  05-11-2007  P  C  P     96
FAI         CONTRACT TEACHER/1400-1530/W&F 01-22-2007 05-11-2007  P  C  P     96
FAI         WOMEN HISTORY                 03-13-2007  03-23-2007  P  C  P      2
FAI         HISTORY OF THE U.S. WEST      02-24-2007  04-28-2007  P  C  P     22
FAI         1 DAY WORKSHOP HISTORY OF FRIC 03-23-2007 03-23-2007  P  C  P      1
FAI         1 DAY WORKSHOP FORCES OF NATUR 03-23-2007 03-23-2007  P  C  P      1
FAI         HEALTH AWARE/DENTIST CARE     01-04-2007  01-04-2007  P  C  P      1
FAI         INTRODUCTION TO SPANISH       10-04-2006  12-13-2006  P  C  P     20
FAI         SWINTEC TYPING CLASS          06-07-2006  06-14-2006  P  C  P      1
FAI         INFANCY PARENTING             04-24-2006  06-12-2006  P  C  P      8
FAI         EARLY CHILDHOOD PARENTING     04-24-2006  06-12-2006  P  C  P      8
FAI         PARENTING ORIENTATION PROGRAM 02-17-2006  04-10-2006  P  C  P      1




G0000      TRANSACTION SUCCESSFULLY COMPLETED
```